[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 26, 2003
THOMAS K. KAHN
CLERK

_____

No. 02-17017

_____

D. C. Docket No. 01-04155-CV-FAM

ALBERT DURRUTHY,

Plaintiff-Appellee,

versus

JENNIFER PASTOR,
Officer, individually,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(November 26, 2003)**

Before HULL, MARCUS and STAHL*, Circuit Judges.

MARCUS, Circuit Judge:

_____

*Honorable Norman H. Stahl, United States Circuit Judge for the First Circuit, sitting by designation.

In this civil rights case, Defendant Jennifer Pastor ("Pastor"), a police officer in the City of Miami, appeals from the district court's denial of her motion for summary judgment on the basis of qualified immunity. Plaintiff Albert Durruthy ("Durruthy"), a freelance cameraman, claims, inter alia, that Pastor violated his rights under the Fourth Amendment when she arrested him for being in the busy intersection of Flagler Street and N.W. 27th Avenue in Miami as the police were trying to keep the streets clear on a chaotic day after the federal government removed young Elian Gonzalez from his family in Miami in order to return him to his father, who lived in Cuba. After thorough review of this record, including a series of videotaped recordings of the incident at issue, we conclude that Pastor is entitled to qualified immunity on Durruthy's wrongful arrest and excessive force claims. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

We review de novo a district court's disposition of a summary judgment motion based on qualified immunity, applying the same legal standards as the district court. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002). A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

2

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We resolve all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to qualified immunity under that version of the facts. See Ferraro, 284 F.3d at 1190.

The relevant facts are straightforward. On April 22, 2000, United States government officials removed a young boy, Elian Gonzalez, from his uncle's house to facilitate the boy's return to his father in Cuba. The reaction in some parts of Miami was immediate and violent. Protestors took to the streets and, as the Plaintiff said, "[t]hat was the day of the riots in Miami." Durruthy Dep. at 17. Some people threw trash bins into the streets and set them on fire. Others threw bottles, rocks, and broken glass. At the major intersection of N.W. 27th Avenue and Flagler Street (one of the intersection's roads has six lanes, the other four), the scene was chaotic during some of the morning. Police were trying to clear the intersection of people and cars. Protesters were arrested at that location. Many cameramen were on hand, including Durruthy.

By Durruthy's account, he knew that Miami police officers were trying to clear the street. He observed that throughout the day he was "shooting officers arresting protesters, clearing the street, and I was shoulder to shoulder with these officers. And officers would grab me and say please, once you get your shot,

please go back from the street, from tear gas, from launching tear gas, from arresting protesters." Durruthy Dep. at 78.

By 11:00 a.m. the intersection of Flagler Street and N.W. 27th Avenue was shut off to vehicular traffic, and police officers had cleared the demonstrators from the street. At that time, the police arrested a cameraman, Bruce Bernstein ("Bernstein"), and escorted him through the middle of the cleared street. Durruthy, a freelance cameraman who was on assignment to film the protests, ran into the street to film Bernstein's arrest up close.

The scene that followed was captured on a series of videotapes filmed by different people (including Durruthy) and from different locations. While Durruthy was filming Bernstein's arrest in the street, an officer instructed Durruthy to get out of the street. Durruthy backpedaled toward the sidewalk, while continuing to film Bernstein's arrest. As Durruthy approached the sidewalk, Officer Pastor grabbed him from behind. Pastor and another officer then pulled Durruthy onto the ground, while struggling to pin his arms behind him and handcuff him. During the struggle, the other officer also kneed Durruthy in the back. Durruthy stated, "Sir, my arm . . . please sir . . . I am going peacefully, sir." Pastor held Durruthy down with her hands, while the other officer tied Durruthy's arms behind his back with flex cuffs. Officer Pastor testified that whenever anyone

4

is being arrested, she assumes that the person is armed with a weapon. She also said that she had never seen the Plaintiff before the day of his arrest.

In a sworn declaration, Durruthy said that during the morning of April 22 other police officers let him enter the street, film his "shot," and return to the sidewalk on several occasions. He further stated that he had followed this procedure "countless" times during the previous four months without incident and with the permission of police. In his deposition, Durruthy testified that throughout that morning he had filmed officers arresting protestors and clearing the streets, and the officers had requested that he move out of the street once he got his "shot." Durruthy did not detail any of the specific circumstances surrounding these earlier incidents, nor did he identify any officer by name. Notably, however, Durruthy does not contend that Pastor allowed him to enter the streets at any time that day or in the past.

Durruthy was charged with resisting, obstructing, or opposing an officer in violation of Fla. Stat. § 843.02,[1] but the charges ultimately were dropped.

_____

[1]This statute provides that:

> Whoever shall resist, obstruct, or oppose any officer as defined in s. 943.10(1), (2), (3), (6), (7), (8), or (9); member of the Parole Commission or any administrative aide or supervisor employed by the commission; county probation officer; parole and probation supervisor; personnel or representative of the Department of Law Enforcement; or other person legally authorized to execute process in the execution of legal process or in the lawful execution of any legal duty,

Subsequently, Durruthy filed a complaint against the City of Miami and Pastor, alleging claims under 42 U.S.C. § 1983 for unlawful arrest and excessive force, in violation of the Fourth Amendment, as well as various state law claims. Pastor moved for summary judgment on the ground that she was entitled to qualified immunity. Pastor argued that not only did she have probable cause to arrest Durruthy for violating § 843.02, but she also had probable cause to arrest him for

---

without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.

Fla. Stat. § 843.02.

violating Fla. Stat. § 316.130,[2] Fla. Stat. § 316.072,[3] and § 54-2 of the Miami City Code.[4]

The district court denied Pastor's motion for summary judgment. First, the court found that there was no probable cause, or even arguable probable cause, to arrest Durruthy. See Durruthy v. City of Miami, 235 F. Supp. 2d 1291, 1297-98 (S.D. Fla. 2002). The court rejected Pastor's proffered bases for probable cause, determining that Fla. Stat. § 843.02, Fla. Stat. § 316.072, and § 54-2 of the Miami City Code were not applicable because Durruthy complied with the officer's

---

[2]Section 316.130 provides, in pertinent part, that "[w]here sidewalks are provided, no pedestrian shall, unless required by other circumstances, walk along and upon the portion of a roadway paved for vehicular traffic." Fla. Stat. § 316.130(3).

[3]Under this statute:

It is unlawful and a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083, for any person willfully to fail or refuse to comply with any lawful order or direction of any law enforcement officer, traffic crash investigation officer as described in s. 316.640, traffic infraction enforcement officer as described in s. 316.640, or member of the fire department at the scene of a fire, rescue operation, or other emergency. Notwithstanding the provisions of this subsection, certified emergency medical technicians or paramedics may respond to the scene of emergencies and may provide emergency medical treatment on the scene and provide transport of patients in the performance of their duties for an emergency medical services provider licensed under chapter 401 and in accordance with any local emergency medical response protocols.

Fla. Stat. § 316.072(3).

[4]Section 54-2 of the Miami City Code provides that "[i]t is unlawful for any person or any number of persons to stand, loiter or walk upon any street or sidewalk in the city so as to obstruct free passage over, on or along said street or sidewalk after a request by a law enforcement officer to move on so as to cease blocking or obstructing free passage thereon." Miami City Code § 54-2(b).

7

orders to get out of the street, even if he backpedaled and continued to film when ordered off the street, and that Fla. Stat. § 316.130 was inapplicable because it is directed at preventing pedestrians from walking among vehicular traffic. The court also found that although there was no specific Florida Supreme Court, Eleventh Circuit, or United States Supreme Court caselaw on point, Pastor's conduct was "obviously illegal, based on the complete lack of any reasonable basis for the arrest." Id. at 1298.

The district court also held that Pastor used excessive force against Durruthy. The court reasoned that because Durruthy was obviously a member of the media, was not protesting, and complied with the officer's requests and instructions, any use of "force was unnecessary. . . . In light of the circumstances, the force applied was illegally disproportionate." Id. at 1300. The district court also determined that it was clearly established that Pastor's conduct constituted excessive force. It acknowledged that there was no controlling and factually similar caselaw, but found that her conduct fell "within the category of cases in which the unlawfulness of the conduct is 'readily apparent even without identifying caselaw.'" Id. at 1301 (quoting Smith v. Mattox, 127 F.3d 1416, 1420 (11th Cir. 1997)). This appeal ensued.

As we observed in Lee v. Ferraro:

8

Qualified immunity offers "complete protection for government officials sued in their individual capacities as long as 'their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known.'" Thomas v. Roberts, 261 F.3d 1160, 1170 (11th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)) (additional quotations omitted). The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, see Anderson v. Creighton, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038, 97 L. Ed. 2d 523 (1987), protecting from suit "all but the plainly incompetent or one who is knowingly violating the federal law." Willingham v. Loughnan, 261 F.3d 1178, 1187 (11th Cir. 2001). Because qualified immunity is a defense not only from liability, but also from suit, it is "important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." GJR Invs., Inc. v. County of Escambia, 132 F.3d 1359, 1370 (11th Cir. 1998) (citation omitted).

284 F.3d at 1193-94. Whether a defendant is entitled to qualified immunity is a question of law, in other words, whether the law at the time of the incident was clearly established so that a reasonable person should have known that he was violating it. See Courson v. McMillian, 939 F.2d 1479, 1487-88 (11th Cir. 1991).

To receive qualified immunity, the public official must show that he was acting within the scope of his discretionary authority at the time the allegedly wrongful acts occurred. See Ferraro, 284 F.3d at 1194. On this record, it is undisputed that Officer Pastor was acting within her discretionary authority. Once it is established that the defendant was acting within her discretionary authority,

9

"the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id. In evaluating claims of qualified immunity, we apply the two-part Saucier test: (1) "As a 'threshold question', a court must ask, '[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?'"; and (2) "If a constitutional right would have been violated under the plaintiff's version of the facts, the court must then determine 'whether the right was clearly established.'" Id. (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001)). This inquiry, in turn, "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" Id. (quoting Saucier, 533 U.S. at 201, 121 S. Ct. at 2156). In Saucier, the Supreme Court noted that "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." 533 U.S. at 201, 121 S. Ct. at 2156. However, if a constitutional right would have been violated under the plaintiff's version of the facts, the court must then determine whether the right was clearly established. See id.

Durruthy argues that Pastor violated his clearly established constitutional rights under the Fourth Amendment by arresting him without probable cause and

10

by subjecting him to excessive force. We conduct the <u>Saucier</u> analysis separately for each of Pastor's claims. <u>See</u> <u>Ferraro</u>, 284 F.3d at 1194.

First, Durruthy says that his arrest was unlawful. Plainly, an arrest without probable cause violates the right to be free from an unreasonable search under the Fourth Amendment. <u>See</u> <u>Redd v. City of Enterprise</u>, 140 F.3d 1378, 1382 (11th Cir. 1998) ("[A]n arrest made without probable cause violates the Fourth Amendment."). Under federal law, probable cause to arrest exists "when an arrest is 'objectively reasonable based on the totality of the circumstances.'" <u>McCormick v. City of Fort Lauderdale</u>, 333 F.3d 1234, 1243 (11th Cir. 2003) (quoting <u>Ferraro</u>, 284 F.3d at 1195). "This standard is met when the facts and circumstances within the <u>officer's knowledge</u>, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." <u>Id.</u> (internal citation and quotation marks omitted). "Although probable cause requires more than suspicion, it 'does not require convincing proof,' and 'need not reach the [same] standard of conclusiveness and probability as the facts

necessary to support a conviction.'" <u>Ferraro</u>, 284 F.3d at 1195 (internal citations omitted).[5]

Moreover, probable cause determinations are generally <u>ex parte</u> determinations, <u>see, e.g.</u>, <u>United States v. R. Enters., Inc.</u>, 498 U.S. 292, 298, 111 S. Ct. 722, 726, 112 L. Ed. 2d 795 (1991) ("The same rules that, in an adversary hearing on the merits, may increase the likelihood of accurate determinations of guilt or innocence do not necessarily advance the mission of a grand jury, whose task is to conduct an <u>ex parte</u> investigation to determine whether or not there is probable cause to prosecute a particular defendant."), which are made on the basis of the evidence extant. <u>See</u> <u>United States v. Gonzalez</u>, 969 F.2d 999, 1003 n.6

---

[5]Pastor's personal motivation for arresting Durruthy is irrelevant to the determination whether she had probable cause. There is no question that an officer's subjective intent is immaterial when there is an objectively reasonable basis for believing that an offense has occurred. <u>See, e.g.</u>, <u>Whren v. United States</u>, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); <u>United States v. Holloman</u>, 113 F.3d 192, 194 (11th Cir. 1997) (<u>per curiam</u>) ("[<u>Whren</u>] conclusively refutes the notion that ulterior motives may invalidate police conduct that is justified on the basis of probable cause to believe that a violation of law has occurred."); <u>see also</u> <u>Holland v. City of Portland</u>, 102 F.3d 6, 9-10 (1st Cir. 1996) (following <u>Whren</u>'s holding with respect to subjective intent in probable cause determinations); <u>United States. v. Dhinsa</u>, 171 F.3d 721, 724-25 (2d Cir. 1998) (same); <u>Rogers v. Powell</u>, 120 F.3d 446, 453 n.5 (3d Cir. 1997) (same); <u>United States v. Bullock</u>, 94 F.3d 896, 899 (4th Cir. 1996) (same); <u>United States v. Escalante</u>, 239 F.3d 678, 680-81 (5th Cir. 2001) (same); <u>United States v. Herbin</u>, 343 F.3d 807, 809-810 (6th Cir. 2003) (same); <u>Williams v. Vasquez</u>, 2003 WL 1796030, *4-*5, 62 Fed. Appx. 686, 690-91 (7th Cir. 2003) (same); <u>Johnson v. Crooks</u>, 326 F.3d 995, 998 (8th Cir. 2003) (same); <u>United States v. Ibarra</u>, 345 F.3d 711, 713-14 (9th Cir. 2003) (same); <u>United States v. Villa-Chaparro</u>, 115 F.3d 797, 801 (10th Cir. 1997) (same); <u>United States v. Bookhardt</u>, 277 F.3d 558, 565-66 (D.C. Cir. 2002) (same); <u>Arkansas v. Sullivan</u>, 532 U.S. 769, 771-72, 121 S. Ct. 1876, 1878, 149 L. Ed. 2d 994 (2001) (rejecting Arkansas Supreme Court's finding that the "subjective intent" language in <u>Whren</u> was nonbinding dicta).

(11th Cir. 1992) ("[T]he court must decide whether the objective facts available to the officers <u>at the time of arrest</u> were sufficient."). Thus, in <u>Pickens v. Hollowell</u>, for example, we held that two deputies "who otherwise had probable cause to arrest [the plaintiff] pursuant to facially valid arrest warrants [] did not have a duty to investigate and decide the potential viability of a defense . . . before arresting [the plaintiff]." 59 F.3d 1203, 1207 (11th Cir. 1995).

We add that officers who make an arrest without probable cause are still "entitled to qualified immunity if there was arguable probable cause for the arrest." <u>Jones v. Cannon</u>, 174 F.3d 1271, 1283 (11th Cir. 1999) (citing <u>Lindsey v. Storey</u>, 936 F.2d 554, 562 (11th Cir. 1991)). Arguable probable cause exists when "an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed." <u>Montoute v. Carr</u>, 114 F.3d 181, 184 (11th Cir. 1997); <u>see also</u> <u>Jones</u>, 174 F.3d at 1283. As we framed the concept in <u>Lee v. Ferraro</u>:

> Arguable probable cause exists "where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[] could have believed that probable cause existed to arrest." <u>Id.</u> (quoting <u>Redd</u>, 140 F.3d at 1382 (internal citations omitted)). In determining whether arguable probable cause exists, "[w]e apply an objective standard, asking 'whether the officer's actions are objectively reasonable . . . regardless of the officer's underlying intent or motivation.'" <u>Vaughan v. Cox</u>, 264 F.3d 1027, 1036 (11th Cir. 2001) (quoting <u>Montoute</u>, 114 F.3d at 184).

13

"Arguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest, which would negate the concept of probable cause and transform arresting officers into prosecutors." Scarbrough v. Myles, 245 F.3d 1299, 1302-03 (11th Cir. 2001).

284 F.3d at 1195.

After thorough review of the entire record, we are satisfied that Pastor had probable cause to arrest Durruthy for violating Fla. Stat. § 316.130,[6] and that, in any event, she had arguable probable cause to effect the Plaintiff's arrest. Again, § 316.130 provides, in pertinent part, that "[w]here sidewalks are provided, no pedestrian shall, unless required by other circumstances, walk along and upon the portion of a roadway paved for vehicular traffic." Fla. Stat. § 316.130(3). Notably, no command or direction by the police to leave the streets is required to establish a violation of this statute.[7] Under Florida law, a law enforcement officer may arrest

---

[6]While Durruthy was charged with violating only Fla. Stat. § 843.02, Pastor is shielded by qualified immunity so long as she had probable cause to arrest Durruthy for any offense. See Bailey v. Bd. of County Comm'rs of Alachua County, 956 F.2d 1112, 1119 n.4 (11th Cir. 1992) ("The validity of an arrest does not turn on the offense announced by the officer at the time of the arrest.").

[7]This is in contrast with the other statutes Pastor has proffered as bases for probable cause, all of which require an order or request: Fla. Stat. § 843.02 (making it a misdemeanor to "resist, obstruct, or oppose any officer"); Fla. Stat. § 316.072(3) (making it a misdemeanor "for any person willfully to fail or refuse to comply with any lawful order or direction of any law enforcement officer"); and § 54-2 of the Miami City Code (making it unlawful for any person to "walk upon any street or sidewalk in the city so as to obstruct free passage . . . after a request by a law enforcement officer to move on so as to cease blocking or obstructing free passage"). Because Pastor had probable cause to arrest Durruthy for violating Fla. Stat. § 316.130, we need not consider whether these other statutes provided additional bases for probable cause.

14

a person without a warrant if "[a] violation of chapter 316 has been committed in the presence of the officer." Fla. Stat. § 901.15(5). It is undisputed that Durruthy was walking in the middle of a street paved for vehicular traffic (the busy intersection of Flagler Street and N.W. 27th Avenue), where sidewalks were provided, and he was not <u>required</u> to do so by other circumstances. Moreover, plainly he was in the middle of the busy street at a chaotic time when the police were attempting to clear the streets, and by his own account, specifically knew that the officers were trying to clear that very intersection.

The district court nevertheless held that no probable cause existed under § 316.130, reasoning:

> The statute is directed at preventing pedestrians from walking among vehicular traffic. In this case, however, there was no vehicular traffic in the roadway. Further, [Durruthy] was not a pedestrian in the normal sense of the word but an obvious member of the media acting within the scope of his journalistic duties. Under these circumstances, an arrest pursuant to § 316.130 could not be reasonable.

<u>Durruthy</u>, 235 F. Supp. 2d at 1298. We disagree. First, the statute does not require that there be vehicular traffic in the roadway at the time of the offense. <u>See</u> Fla. Stat. § 316.130(3); <u>see also</u> Fla. Stat. § 316.003(42) (defining "roadway" as "[t]hat portion of a highway improved, designed, or <u>ordinarily used</u> for vehicular travel, exclusive of the berm or shoulder" (emphasis added)). Nor was it a surprise to

15

anyone at that intersection on the morning of April 22, 2000, that the police had cleared protesters from the street. Second, the definition of "pedestrian" as "[a]ny person afoot," Fla. Stat. § 316.003(28), contains no exception for anyone, including members of the media. Indeed, at oral argument, Plaintiff conceded that Durruthy was entitled to no special deference or exception simply because he was a cameraman.

Simply put, our case law makes clear that probable cause exists whenever an officer reasonably believes that an offense is being committed. It is therefore difficult to understand the claim that no probable cause, let alone arguable probable cause, existed to arrest Durruthy when the undisputed facts show him to have been in unmistakable violation of Fla. Stat. § 316.130(3). The wording of that provision says nothing about giving exemptions to people who violate the command of the statute when its intended purpose is otherwise satisfied. A driver who runs a red light when no other cars or pedestrians are around is not exempt from a traffic law requiring him to stop, even though the obvious purpose of the law -- preventing accidents -- may be moot at the time. Section 316.130(3) unambiguously says that "[w]here sidewalks are provided, no pedestrian shall, unless required by other circumstances, walk along and upon the portion of a roadway paved for vehicular traffic." No one has denied that Durruthy did just

16

that. Nor is there any suggestion in the record that circumstances somehow required or compelled him to walk in the intersection.

The heart of Durruthy's argument is that there was no probable cause for his arrest because he had permission to be in the street. The first problem with this contention is that there is <u>no</u> evidence Durruthy had express permission to be in the street at the time and location of the arrest. His evidence of "permission" is vague, general, and stated at the highest order of abstraction. The most that can be said is that other unnamed officers allowed him to be in unspecified streets, at unspecified locations, and under unexplained circumstances, <u>earlier</u> that morning, and that in the preceding four months he had gotten the implied and express permission of still other unnamed officers to shoot pictures in the street at unspecified locations and under unexplained circumstances.

In the second place, there is no evidence that Pastor knew other officers previously had allowed Durruthy to be in the street under unspecified circumstances, and, significantly, probable cause is determined based on the "facts and circumstances within the <u>officer's knowledge</u>." <u>McCormick</u>, 333 F.3d at 1243; <u>see also</u> <u>Dahl v. Holley</u>, 312 F.3d 1228, 1233 (11th Cir. 2002) (holding that the probable cause standard is met if, "at the moment the arrest was made, 'the facts and circumstances <u>within</u> [the officers'] knowledge and of which they had

17

reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [the suspect] had committed or was committing an offense." (emphasis added) (quoting Hunter v. Bryant, 502 U.S. 224, 228, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991))); see also Wilson v. Kittoe, 337 F.3d 392, 398 (4th Cir. 2003) (same); Thacker v. City of Columbus, 328 F.3d 244, 255 (6th Cir. 2003) (same); Johnson v. Campbell, 332 F.3d 199, 211 (3d Cir. 2003) (same); Jocks v. Tavernier, 316 F.3d 128, 135 (2d Cir. 2003) (same); United States v. Fiasconaro, 315 F.3d 28, 34-35 (1st Cir. 2002) (same); United States v. Wesley, 293 F.3d 541, 545 (D.C. Cir. 2002) (same); United States v. Henderson, 241 F.3d 638, 648 (9th Cir. 2000) (same); McFarland v. Childers, 212 F.3d 1178, 1186 (10th Cir. 2000) (same); Spiegel v. Cortese, 196 F.3d 717, 723 (7th Cir. 1999) (same); Sanders v. Sears, Roebuck & Co., 984 F.2d 972, 976 (8th Cir. 1993) (same); Martin v. Thomas, 973 F.2d 449, 453 (5th Cir. 1992) (same).

Finally, even if we could somehow impute such knowledge to Pastor, we can discern no grounds for saying that she could not enforce Fla. Stat. § 316.130(3) simply because other officers in unspecified circumstances had not enforced it. The aforementioned driver who runs a red light does not get a free pass just because he ran another red light earlier in the day and was not stopped for that violation. Notably, mere selective enforcement of a law is not

18

unconstitutional, and Durruthy has not even alleged selective prosecution based on improper grounds. See United States v. Lichenstein, 610 F.2d 1272, 1281 (5th Cir. 1980) ("Though selective prosecution, if based on improper motives, can violate constitutional guarantees of equal protection, selective enforcement in and of itself is not a constitutional violation. Therefore, to support a defense of selective prosecution, one must establish (1) that others similarly situated have not generally been prosecuted and (2) that the government's discriminatory selection of him is invidious, or in bad faith that is based on constitutionally impermissible considerations, such as race or religion." (citing Oyler v. Boles, 368 U.S. 448, 456, 82 S. Ct. 501, 506, 7 L. Ed. 2d 446 (1962), and United States v. Johnson, 577 F.2d 1304, 1308 (5th Cir. 1978))).[8]

Durruthy also points to an internal City of Miami Police Department Order saying that "[n]o warrantless arrest of media personnel for non-felonious acts arising out of the pursuit of the news gathering function will be made without the express authority of the senior on-duty commanding officer or the staff duty officer." R1-56, exhibit G. We are unable to understand how Pastor's failure to comply with this internal police department guideline vitiates probable cause.  By

---

[8]Fifth Circuit decisions rendered prior to September 30, 1981 are binding precedent on this court. See Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981).

19

its own terms, the guideline doesn't alter the elements of § 316.130, provide an affirmative defense, create any enforceable rights in a defendant, or otherwise undermine probable cause. Cf. United States v. Beard, 41 F.3d 1486, 1489 (11th Cir. 1995) (holding that the Department of Justice's dual prosecution policy "is an internal policy [of self-restraint] which confers no enforceable rights on a criminal defendant"). Nor does it address precisely how an officer should react to the circumstances of directly seeing a violation of § 316.130 on a busy street at a chaotic time.

We add that for qualified immunity purposes we are concerned only with the constitutional requirements of probable cause. See Craig v. Singletary, 127 F.3d 1030, 1044 (11th Cir. 1997) (holding that, for purposes of determining whether probable cause exists, "we are only concerned with constitutional requirements . . . not with any local policies or with any strategic decisions of law enforcement officers"). The fact that Pastor may have violated an internal guideline may subject her to internal sanction, but it does not undermine objective facts -- the Plaintiff was walking in the middle of a busy intersection at a chaotic time with specific knowledge that the police were trying to clear that street, and he was not required to be in the street -- that otherwise establish probable cause, let

20

alone arguable probable cause.   Simply put, the internal guideline does not convert an illegal act suddenly into a legal one.

Moreover, even though we believe Pastor had probable cause to arrest Durruthy for violating  Fla. Stat. § 316.130, she would also be "entitled to qualified immunity if there was [even] arguable probable cause for the arrest." Jones, 174 F.3d at 1283 (emphasis added). Here, Pastor was faced with making a close call on a difficult day, under chaotic circumstances. She had no knowledge that Durruthy previously had been allowed, by unknown officers and under unspecified conditions, to shoot pictures in the street. A reasonable officer could have believed, in light of the information Pastor possessed, that she had probable cause. See Montoute, 114 F.3d at 184 (holding that arguable probable cause exists when "an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed").

We add that even if Durruthy had actually alleged the violation of a constitutional right, such a violation was not clearly established.  A party may show that the law was clearly established, first by pointing to "'a materially similar case [that has] already decided that what the police officer was doing was unlawful.'" Lee v. Ferraro, 284 F.3d at 1198 (citation omitted).  A party may also demonstrate the existence of clearly established law when "the words of the

pertinent federal statute or federal constitutional provision . . . [are] specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the total absence of case law. This kind of case is one kind of 'obvious clarity' case." Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002) (footnote omitted) (emphasis in original). Thus, "the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful." Id. (emphasis added).

No caselaw gave Pastor fair warning that she would be charged with the knowledge that other officers previously allowed Durruthy to film in the street, or that she somehow lacked probable cause to arrest Durruthy for violating § 316.130 because of that "permission." See Williams v. Consol. City of Jacksonville, 341 F.3d 1261, 1270 (11th Cir. 2003) (noting that in determining whether the unlawfulness of an official's actions was clearly established, "the salient question . . . is whether the state of the law [at the time of the unconstitutional act] gave [the official] fair warning that [her] alleged treatment of [the plaintiff] was unconstitutional" (quoting Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516, 153 L. Ed. 2d 666 (2002)). Nor was Pastor on notice that an internal departmental guideline requiring her to obtain a superior officer's approval before

22

making a misdemeanor arrest rendered an arrest otherwise based on probable cause unconstitutional or somehow vitiated that probable cause. No case to which we have been cited, or that we can find, even remotely suggests that the possible violation of an internal law enforcement guideline strips an officer of qualified immunity for an arrest founded on sufficient cause. In this context, we are reminded of the Supreme Court's admonition in County of Sacramento v. Lewis:

> Like prison officials facing a riot, the police on an occasion calling for fast action have obligations that tend to tug against each other. Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made "in haste, under pressure, and frequently without the luxury of a second chance."

523 U.S. 833, 853, 118 S. Ct. 1708, 1720, 140 L. Ed. 2d 1043 (1998) (citation omitted). Moreover, nothing found in the language of § 316.130 or in the command of the Fourth Amendment states with "obvious clarity" that Pastor's conduct in arresting Durruthy was unlawful. See Vinyard v. Wilson, 311 F.3d at 1350.[9]

---

[9]Parallels between this case and Hope, 536 U.S. 730, 122 S. Ct. 2508, are difficult to discern. There, the Supreme Court found a clear violation of the Eighth Amendment right to be free from cruel and unusual punishment when corrections officers handcuffed an inmate to a hitching post for seven hours in the hot sun without a bathroom break, all the while taunting the inmate about his thirst. Despite the absence of any emergency, the corrections officers knowingly subjected Hope to a substantial risk of physical harm and to unnecessary pain. Under these circumstances the Supreme Court observed that "[a]rguably, the violation was so obvious that our own Eighth Amendment cases gave the respondents fair warning that their conduct violated the Constitution. Regardless, in light

23

Durruthy also claims that Pastor used excessive force when she arrested him. "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." Ferraro, 284 F.3d at 1197 (citation omitted). "The question is whether the officer's conduct is objectively reasonable in light of the facts confronting the officer." Vinyard v. Wilson, 311 F.3d at 1347. We begin by observing that "[w]hen an officer lawfully arrests an individual for the commission of a crime, no matter how minor the offense, the officer is entitled under controlling Supreme Court precedent to effectuate a full custodial arrest." Ferraro, 284 F.3d at 1196. Indeed, under Florida law, like under federal law, a full custodial arrest is allowed even when the offense is only a misdemeanor. See Fla. Stat. § 901.15(1) ("A law enforcement officer may arrest a person without a warrant when . . . [t]he person has committed a felony or misdemeanor . . . in the presence of an officer."). In this inquiry, we consider such factors as "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety

_____

of binding Eleventh Circuit precedent, an Alabama Department of Corrections (ADOC) regulation, and a DOJ report informing the ADOC of the constitutional infirmity in its use of the hitching post, we readily conclude that the respondents' conduct violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Id. at 741-42 (citing Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982). No such notice existed in the case before us, nor were the police acts in arresting Durruthy for being in the middle of a busy intersection (in violation of Fla. Stat. § 361.130(3)) as they tried to keep the streets clear on a chaotic and riotous day remotely like the egregious conduct proscribed in Hope.

24

of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Ferraro, 284 F.3d at 1197-98 (quoting Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443 (1989)).

The district court determined that the force applied by Pastor was illegally disproportionate because no force was acceptable under these circumstances. See Durruthy, 235 F. Supp. 2d at 1300. We disagree. This circuit has made clear that some use of force by a police officer when making a custodial arrest is necessary and altogether lawful, regardless of the severity of the alleged offense. See Ferraro, 284 F.3d at 1197 ("'Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" (quoting Graham, 490 U.S. at 396, 109 S. Ct. at 1871-72)). Quite simply, the police were allowed to use some force in effecting the Plaintiff's arrest. Furthermore, "the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." See Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000). Here, even if the force applied by Pastor in effecting the arrest -- forcing Durruthy down to the ground and placing him in handcuffs -- was unnecessary, plainly it was not unlawful. The amount of force used was de minimus. In fact, the quantum of force used here was far less

25

than our Court has sustained in other contexts. See id. at 1255 (finding force to be de minimus where an officer grabbed the plaintiff "from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and handcuffed him"); see also Jones v. City of Dothan, 121 F.3d 1456, 1460 (11th Cir. 1997) (finding the force used to be minor where officers slammed the plaintiff against a wall, kicked his legs apart, required him to put his arms above his head, and pulled his wallet from his pants pocket).

Notably, Durruthy had not been restrained at the time the force was applied, distinguishing the instant case from two cases on which the district court relied. See Ferraro, 284 F.3d at 1191, 1198-99 (finding excessive force where the plaintiff was already handcuffed when an officer slammed her head on the car); Priester v. City of Riviera Beach, 208 F.3d 919, 927 (11th Cir. 2000) (concluding that the force was excessive where a police officer released an attack dog on the plaintiff while the plaintiff was lying on the ground and the police officer's gun was pointed at the plaintiff's head). The pivotal question in this case is really whether the arrest was lawfully founded on probable cause (or at least arguable probable cause). We are satisfied on this point. Moreover, on the facts presented here, we also find that the physical restraint and handcuffing of the Plaintiff was

26

likewise lawful.[10] The force used to effect the Plaintiff's arrest was de minimus, not excessive under the Fourth Amendment. Because we find no constitutional violation, we need not address whether the constitutional right at issue was clearly established.

Accordingly, we reverse the district court's denial of the defense of qualified immunity and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

---

[10]Durruthy also argues that the force used aggravated a pre-existing shoulder injury. We have observed, however, in a similar context that "[w]hat would ordinarily be considered reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which was unknown at the time." Rodriguez v. Farrell, 280 F.3d 1341, 1353 (11th Cir. 2002). On this record, there is no evidence that Pastor, before the arrest, had any knowledge of Durruthy's pre-existing condition.

STAHL, Circuit Judge, dissenting:

The defense of qualified immunity attempts to strike a balance between the need for a remedy to protect the rights of citizens from government excess and the need for government officials to be able to carry out their discretionary functions without fear of constant litigation. GJR Investments, Inc. v. County of Escambia, Fla., 132 F.3d 1359, 1366 (11th Cir. 1998). In this case, we address the violation of a clearly established constitutional right by a police officer who had more than enough awareness of the surrounding circumstances to know that her arrest of plaintiff Albert Durruthy, and the force used in so doing, was not only unnecessary, but unlawful. Whether under a standard of probable cause or arguable probable cause to arrest, the facts of this case, made all the more apparent and troubling by videotape evidence of the arrest, preclude any notion that Officer Pastor, or any reasonable police officer, could have believed that probable cause to arrest existed. Qualified immunity is inappropriate here, especially at the summary judgment stage. Accordingly, with respect, I dissent.

First, we must consider the threshold issue of whether Durruthy's allegations, if taken as true, establish a violation of his constitutional right against unlawful arrest under the Fourth Amendment of the federal Constitution. See Hope v. Pelzer, 536 U.S. 730 (2002). The evidence shows that there simply was

28

no reason for Durruthy's arrest. The videotape squarely refutes Pastor's initial stated basis for the arrest of Durruthy, which was allegedly his obstruction of an officer's arrest of Bruce Bernstein, an NBC cameraman, and his failure to obey another officer's order to leave the street. See Fla. Stat. § 843.02. There were no acts of civil obedience taking place and no protestors or moving vehicles in the street. Moreover, the police were not clearing the area in which Durruthy was filming. Pastor herself was standing in a line of officers approximately sixty feet away from Durruthy. She left the line, without the permission of any superior officer, and rushed over to Durruthy though she plainly saw that he was following another officer's direct order to "get off the street." She admitted that she was aware that Durruthy was a member of the press and saw that he was carrying a large television camera, but nonetheless helped pin him to the ground and forcibly secure him by wrenching his right arm behind his back and pressing his head to the sidewalk. Though Durruthy repeatedly pled with Pastor and the other officers that he would go peacefully and that his "bad arm" would not bend backward, Pastor and the other officers did not relent.

In addition, George Bouza--Durruthy's "sound man" who recorded audio of the events--approached the scene, attempted to inform the attending police officers, including Pastor, that he was Durruthy's partner, and convinced the

29

officers to give him Durruthy's camera, which they had taken from Durruthy before forcing him to the ground. Yet, Pastor continued to pin Durruthy to the sidewalk and proceed with the arrest without regard to the obvious pain and injury she was inflicting even though Durruthy was neither resisting the officers nor presenting any danger. Pastor knew all of this. Thereafter, Durruthy was held in a police van without medical care for six hours before being released. A prudent officer with Pastor's knowledge of the situation, under the circumstances, could not have believed that Durruthy had committed, was committing, or was about to commit an offense which justified arrest.

Moreover, when Durruthy and his criminal defense attorney met with the State Attorney several weeks after the arrest, Durruthy's counsel showed the State Attorney the videotape of the arrest. The State Attorney immediately decided to drop all charges against Durruthy, and asked him to sign a release of liability in favor of the Miami Police Department and its officers. Durruthy refused to sign the release.

In a thoughtful opinion, the district court concluded that a reasonable jury could find that Pastor arrested Durruthy without probable cause. See Durruthy v. City of Miami, 235 F. Supp.2d 1291 (S.D. Fla. 2002). The court further found that there was sufficient evidence to show that Pastor did not even have arguable

probable cause, that is, there existed sufficient proof that "no reasonable police officer in the position of Pastor could have believed that there was probable cause to arrest Plaintiff." Id. at 1296-97.

The majority's decision adopts Pastor's argument made to the district court that even if there was no probable cause or arguable probable cause to arrest Durruthy for obstructing or resisting the officers, there was probable cause or at least arguable probable cause to arrest him under Fla. Stat. § 316.30. The district court found this argument unconvincing because § 316.130 "is directed at preventing pedestrians from walking among vehicular traffic" and "there was no vehicular traffic in the roadway." Durruthy, 235 F. Supp.2d at 1298. The majority points out that the statute does not require that there be vehicular traffic in the roadway at the time of the offense and that it contains no exception for anyone, including members of the media. Indeed, Durruthy acknowledges that he was not entitled to a special exception because he was a cameraman. The fact that he was a cameraman, however, and that he was performing his duties as a cameraman at the time of the arrest goes to the core of the qualified immunity analysis.

And that is where the district court is correct and the majority of this Court wrong with respect to Pastor's arguable probable cause to arrest under § 316.130. Again, the district court pointed out that "[t]he statute is directed at preventing

31

pedestrians from walking among vehicular traffic." 235 F. Supp.2d at 1298.

Notwithstanding what the statute does and does not require, "an arrest pursuant to § 316.130 could not be reasonable" given that at the time of the arrest, Pastor knew that "there was no vehicular traffic in the roadway" and that Durruthy was "an obvious member of the media acting within the scope of his journalistic duties." Id. In my view, the district court correctly analyzed the applicability of § 316.130 in terms of whether Pastor, at the time of the arrest and given her knowledge of the circumstances, had arguable probable cause to arrest based on § 316.130. The inquiry is not whether Durruthy actually violated the statute or whether the elements of the statute were met, but whether it was objectively reasonable for Pastor to arrest Durruthy given the obvious circumstances. Pastor's invocation of § 316.130 fails to amount even to an after-the-fact excuse for her actions. Durruthy was charged only with obstruction of an officer under Fla. Stat. § 843.02, and that charge was dropped immediately by the State Attorney upon viewing the videotape of the arrest. Pastor never articulated § 316.130 as the purported basis for the arrest at the time of the arrest and raised it as a justification for the arrest only after the commencement of this litigation. Though I acknowledge that an arrest is not rendered invalid by the fact that the basis for the arrest, though legitimate, was merely pretextual, see Whren v. United States, 517

32

U.S. 806, 813 (1996), we should "be troubled by an argument suggesting that a legitimate basis for an arrest identified only after the arrest would provide sufficient grounds therefor." Rogers v. Powell, 120 F.3d 446, 453 n.5 (3d Cir. 1997) (emphasis added). Moreover, it is patently obvious to any observer of the videotape evidence that the sole reason for Pastor's conduct was that she and the other officers wanted Durruthy to stop filming the arrest of the NBC cameraman. No one has argued that the mere act of Durruthy's filming is a crime, unlike the scenarios in Whren, United States v. Holloman, 113 F.3d 192 (11th Cir. 1997), and other cases cited by the majority where the officers' purported bases for arrest were obvious pretexts for suspicion of drug possession, murder, and other crimes.

The majority states that "[t]he heart of Durruthy's argument is that there was no probable cause for his arrest because he had permission to be in the street" and proceeds to discredit Durruthy's testimony as "vague, general, and stated at the highest order of abstraction." Given that the case is at the summary judgment stage, we must resolve all issues of material fact in favor of Durruthy before determining the legal question of whether the defendant is entitled to qualified immunity under Durruthy's version of the facts. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002). Durruthy's testimony on whether he had permission to be in the street still leaves a genuine issue of material fact as to whether Pastor

was aware, with notice that Durruthy (and the media overall) was authorized to be in the street, that she was violating a clearly established federal right when she arrested him.  See Penn v. City of Miami, 1999 WL 1050059, *18 (S.D. Fla. Sept. 7, 1999).

As to the issue of whether Durruthy's constitutional right against illegal arrest was "clearly established," the majority relies on this Circuit's "rigid gloss" of how exactly such a right is "clearly established."  Hope, 536  U.S. at 739. Durruthy has argued that Pastor's violation of a Miami Police Department internal policy shows Pastor's knowledge of the unlawfulness of her actions.  The policy reads:

> No warrantless arrest of media personnel for non-felonious acts arising out of the pursuit of the news gathering function will be made without the express authority of the senior on-duty commanding officer or the staff duty officer.

City of Miami's Office Bulletin #00-4 dated January 14, 2000. Chief of Police Raul Martinez explained that the Department's media policy granted a higher degree of courtesy to members of the media than to average citizens and that if a member of the media complies with a police officer's request to move, such compliance should be the end of the incident.

34

The majority claims that it cannot find any precedent that "even remotely suggests that the possible violation of an internal law enforcement guideline" defeats an official's qualified immunity. Hope, however, a decision by the United States Supreme Court that directly addresses this Circuit's strict view of qualified immunity, stands in part on guidelines and regulations issued by law enforcement. Hope, an inmate assigned to Limestone Correctional Facility in Alabama, was twice handcuffed to a "hitching post" for several hours as punishment for disruptive behavior. This Court found that though "cuffing an inmate to a hitching post for a period of time extending past that required to address an immediate danger or threat is a violation of the Eighth Amendment," Hope v. Pelzer, 240 F.3d 975, 980 (11th Cir. 2001), the defendant prison guards were still entitled to qualified immunity because "there was no clear, bright-line test established [at the time of the violation] that would survive our circuit's qualified immunity analysis." Id. at 981. This Court went on to explain that "it is important to analyze the facts in...[prior] cases, and determine if they are 'materially similar' to the facts in the case in front of us." Id. "[A]nalogous" facts, the Court concluded, are not enough. Id. Instead, the facts must be "'materially similar' to Hope's situation." Id.

35

The Supreme Court reversed and rejected this Court's analysis and asserted that "this rigid gloss on the qualified immunity standard . . . is not consistent with our cases." Hope, 536 U.S. at 739. The Court continued:

> officials can still be on notice that their conduct violates established law even in novel factual circumstances. . . . Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with "materially similar" facts. ... [T]he salient question that the Court of Appeals ought to have asked is whether the state of the law in 1995 gave respondents fair warning that their alleged treatment of Hope was unconstitutional.

Id. at 741.

The Court, as part of its analysis, considered (1) a regulation issued by the Alabama Department of Corrections (ADOC) and (2) a report and advisory letter issued by the U.S. Department of Justice to the ADOC before the incidents of Hope's mistreatment. The ADOC regulation authorized the use of the hitching post when an inmate refused to work or was otherwise disruptive to the prison work squad. It provided that an activity log should be completed for each such inmate, detailing his responses to offers of water and bathroom breaks every fifteen minutes. The regulation also stated than an inmate had to be released back into the work squad whenever he told an officer that he was ready to go back to

36

work.  The log was not completed for Hope's second shackling, which lasted for seven hours, and the evidence showed that the periodic offers contemplated by the regulation were never made to Hope.  The evidence also showed that the regulation was frequently ignored for other prisoners.  The Court concluded that the regulation and the fact that the prison guards "could ignore it with impunity" provided "strong support for the conclusion that they were fully aware of the wrongful character of their conduct."  Id. at 744.

In addition, the Court asserted that "its conclusion 'that a reasonable person would have known' [was] buttressed" by a report and letter sent to the ADOC from the U.S. Department of Justice in which the DOJ specifically advised that the systematic use of the hitching post constituted improper corporal punishment.  See id. at 745.  The Court concluded that though the DOJ's views may not have been communicated to the prison guards, the "exchange lends support to the view that reasonable officials in the ADOC should have realized that the use of the hitching post under the circumstances alleged by Hope violated the Eighth Amendment prohibition against cruel and unusual punishment."  Id.

The majority asserts that the existence of the Miami Police Department's internal guideline "does not undermine objective facts" surrounding the scene of the incident.  Indeed, the guideline "does not convert an illegal act suddenly into a

37

legal one." It does, however, bear strongly on Pastor's knowledge of the circumstances, of how she should act in such circumstances, and ultimately on the issue of whether a reasonable police officer with her knowledge would have probable cause to arrest Durruthy. Again, Pastor admits that she knew Durruthy was a member of the media. Her knowledge of the guideline put her on clear notice that she was not supposed to arrest a newsman without permission from a supervising officer. As the district court correctly assessed, "When an obvious member of the media approaches a police officer in a cleared street, is instructed to return to the sidewalk, and complies with the instruction, a police officer should be aware that a custodial arrest based on interference with a police officer is illegal." 235 F. Supp.2d at 1298. It is on these objective facts that the Miami PD's internal guideline sheds additional light in favor of finding against qualified immunity at the summary judgment stage.

Notwithstanding the issue of whether and how much notice the Miami PD's internal guideline provided, this case is very similar to Holmes v. Kucynda, 321 F.3d 1069 (11th Cir. 2003), where Atlanta police arrested the plaintiff, Holmes, for constructive possession of cocaine and marijuana. At the time of the arrest, the police had reason to believe that Holmes was just a visitor in the apartment where the drugs were discovered. She specifically informed the officers that she did not

38

reside in the apartment, her suitcases still had clothes in them, her toiletry items were found in a travel bag, and her driver's license indicated that she lived in Norcross, Georgia. Id. at 1081. Other than her mere presence in the house, the evidence showed nothing from which to infer that Holmes had knowledge of, control or dominion over, the drugs. See id. Thus, there was reason to know that she was not in possession of the drugs. In reversing the district court's award of summary judgment to the arresting officers, this Court observed that similar reported cases need not be identified after Hope. Id. at 1078. Under the Eleventh Circuit's "arguable probable cause" standard, this Court inquired, taking the facts in the "light most favorable to Holmes," id. at 1081, whether a reasonable officer would have known there existed no arguable probable cause to make the arrest. The Court held that "it was not even arguably reasonable for Officer Rolfe to arrest Holmes for constructive possession of illegal contraband." Id. Hence, qualified immunity was not proper at the summary judgment stage.

The unique facts here on their own establish the egregiousness and illegality of Officer Pastor's conduct. Pastor "did not need specific case law to give her fair warning that an arrest in these circumstances could violate Plaintiff's Fourth Amendment rights." Durruthy, 235 F. Supp.2d at 1298. The majority opinion sets the bar prohibitively high and tips the balance contemplated by qualified immunity

39

away from the Constitution. Aggrieved individuals will have less incentive to challenge unwarranted and unconstitutional government actions because monetary compensation for their harms is unavailable. In the end, unconstitutional government action is more likely to go unchallenged and unchanged. That is our ultimate concern.

Hence, in my view, the district court did not err by denying Pastor qualified immunity at the summary judgment stage and I would affirm that decision.