[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 30, 2003
THOMAS  K. KAHN
CLERK

_____

No. 02-16956

_____

D. C. Docket No. 01-07930-CV-FAM

ELLEN STORCK,

Plaintiff-Appellant,

versus

CITY OF CORAL SPRINGS, a Florida municipality,
and CITY OF CORAL SPRINGS POLICE OFFICERS
RANDOLPH, CAFFRAY, and MCHUGH,
in their individual capacities,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 30, 2003)

Before HULL, MARCUS and STAHL[*], Circuit Judges.

MARCUS, Circuit Judge:

_____

[*] Honorable Norman H. Stahl, United States Circuit Judge for the First Circuit, sitting by
designation.

Ellen Storck appeals from the district court's entry of summary judgment based on its finding that Officer Joseph McHugh of the Coral Springs Police Department ("CSPD") was entitled to qualified immunity in this § 1983 civil rights action. She claimed that Officer McHugh violated her rights under the Fourth Amendment when he falsely arrested her for obstructing justice. On appeal, Storck argues that McHugh did not have actual or arguable probable cause to arrest her and accordingly was not entitled to qualified immunity.

Upon thorough review of the record, we conclude that Officer McHugh had arguable probable cause to arrest Storck for interfering with and obstructing his execution of legal process -- a Broward County Circuit Court-ordered custody decree directing the police to take Storck's son into custody immediately and turn him over to the Suffolk County Department of Social Services ("Suffolk DSS"). On this record, Officer McHugh was entitled to qualified immunity, and accordingly we affirm.

## I.

We review de novo a district court's disposition of a summary judgment motion based on qualified immunity, applying the same legal standards as the district court. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002). A motion for summary judgment should be granted when "the pleadings, depositions,

2

answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In making this assessment, we view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion, and resolve all reasonable doubts about the facts . . . in favor of the non-movant." Hyman v. Nationwide Mut. Fire Ins. Co., 304 F.3d 1179, 1185 (11th Cir. 2002) (internal quotation marks, citations, and brackets omitted); Lee v. Ferraro, 284 F.3d at 1190.

The sad facts surrounding this child-custody case began on August 1, 1992, when the Suffolk DSS took Aaron Storck ("Aaron"), the youngest of Plaintiff Storck's four children, into protective custody after a New York hospital, which had been treating Aaron, contacted the Suffolk DSS about possible child abuse. The Suffolk DSS subsequently commenced an action in New York Family Court against Storck, alleging neglect and seeking the removal of all four of her children.

On March 24, 1993, after a full evidentiary hearing, the New York Family Court found that Storck suffered from Munchausen Syndrome by Proxy, a psychological disorder in which a person fabricates symptoms of illness in her child for the purpose of gaining the attention of medical personnel. Based on this

3

finding, the New York Family Court entered an Order removing Aaron from his mother's custody and placing him with a foster family in Suffolk County ("New York Family Court Order"). At Storck's request, Aaron was later sent to live with relatives in Ohio.

In November 1996, Ohio Social Services alerted the Suffolk DSS that the New York Family Court Order, which had been modified to direct that Aaron stay with relatives in Ohio, was about to expire. Indeed, the order did expire on December 31, 1996. In early January 1997, Suffolk DSS moved to extend the already-expired order. At that point, however, Storck had already moved to Ohio and reunited with Aaron. On February 4, 1997, the New York Family Court entered an Order extending Aaron's placement with the Ohio relatives, and on March 20, 1997, it ordered that Storck was to have no contact with Aaron for another year (collectively, "New York Family Court Order II").

The following month, Storck moved with Aaron and her other three children to Coral Springs, Florida. At that time, Storck was not aware of New York Family Court Order II, which extended Aaron's placement with the Ohio relatives and prohibited her from contacting Aaron. After moving to Florida, on May 20, 1997, Storck filed, in the United States District Court for the Eastern District of New York, a § 1983 civil rights action against Suffolk County, Suffolk County DSS,

4

and various doctors, lawyers, and caseworkers who had helped take Aaron away in 1992.[1]

On June 10, 1997, the New York Family Court ordered Aaron removed to the custody of the Florida Department of Children and Family Services ("Florida DCFS"), and on June 17, 1997, it demanded that Storck appear before it to explain her alleged violation of New York Family Court Order II (collectively, "June Removal Order"). Thereafter, two Florida DCFS caseworkers and two CSPD officers came to Storck's Coral Springs residence armed with a faxed copy of the June Removal Order. While Storck was talking to the police, Aaron, who has all along maintained his mother's innocence, snuck out of a back window in the apartment and hid at a neighbor's house. As the officers sat in her living room, Storck consulted with Aaron's attorneys on the telephone and discovered that the June Removal Order was not properly domesticated in Florida and therefore was unenforceable. During this meeting, Storck advised the CSPD officers that she

---

[1] On July 26, 2002, the district court dismissed all of these claims based on the Rooker-Feldman doctrine. See District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 482, 103 S. Ct. 1303, 1314-15, 75 L. Ed. 2d 206 (1983); Rooker v. Fidelity Trust Co., 263 U.S. 413, 416, 44 S. Ct. 149, 150, 68 L. Ed. 362 (1923). "Rooker- Feldman bars lower federal court jurisdiction where four criteria are met: (1) the party in federal court is the same as the party in state court; (2) the prior state court ruling was a final or conclusive judgment on the merits; (3) the party seeking relief in federal court had a reasonable opportunity to raise its federal claims in the state court proceeding; and (4) the issue before the federal court was either adjudicated by the state court or was inextricably intertwined with the state court's judgment." Amos v. Glynn County Bd. of Tax Assessors, 347 F. 3d 1249, 1265 n.11 (11th Cir. 2003) (internal citations omitted).

would not give Aaron to them and declined to let the officers look at Aaron, who Storck represented was asleep. In her deposition, she denied that she told Aaron to sneak out of the house if the police came. Before leaving, the officers specifically advised Storck that they would come back for Aaron and could arrest her if she interfered at that later date. Thus, after this incident, Storck was aware that (1) the CSPD would return with an order concerning Aaron's custody, and (2) the CSPD could arrest her if she interfered with the execution of that order.

Storck then filed an emergency motion in Broward County Circuit Court for a temporary injunction to bar the Florida DCFS from domesticating, enforcing, or executing the June Removal Order. The Broward County Circuit Court granted temporary injunctive relief on June 20, 1997. A few months later, on August 25, 1997, the New York Family Court entered still another order excusing Storck for having failed to comply with its Order II, having found that there was no evidence that she was given notice of it. But the New York Family Court again unambiguously ordered that Aaron be handed over to Suffolk DSS ("August Removal Order"). Suffolk DSS lodged a verified petition in Broward County Circuit Court to domesticate and enforce the August Removal Order.

On January 9, 1998, the Broward County Circuit Court issued an "Order on Verified Counter Petition to Recognize and Enforce Out-of-State Custody Decree" ("Broward County Circuit Court Order"), which provided, in pertinent part:

> This cause having been heard ex-parte, and a verified Petition to recognize and enforce an out of state custody decree from New York, for the return of the minor child Aaron Storck having been filed in this case, alleging facts sufficient to authorize taking into custody the child, upon review of the pleading and being otherwise advised in the premises,
>
> **THEREFORE,** the Sheriff of Broward County and all Sheriffs of the State of Florida are **HEREBY ORDERED AND DIRECTED TO FORTHWITH** take into custody [Aaron] from anyone who has possession and immediately turn him over to [Suffolk DSS] or the Florida [DCFS] for temporary custodial assistance. The Sheriff is authorized and directed to serve and enforce this Order in the daytime or in the nighttime, and if necessary to break the door where the minor child is believed to be residing or being kept. The Sheriff shall not delay the execution of this Order for any reason or permit the situation to rise where [Storck] is allowed to remove the child from the jurisdiction of this Court.
>
> Should the Respondent, Ellen Storck, or any other person, in any way violate the mandates of this Order in the presence of the Law Enforcement Officer, said Officer is to immediately arrest and incarcerate the offending party until such time [as] the attending party may be brought before this Honorable Court for further proceedings as this Court may deem just and proper under the circumstances.

Should [Storck] **REFUSE TO RELEASE THE LOCATION OF THE MINOR CHILD** [Storck] **SHALL BE ARRESTED AND TAKEN BEFORE THE ISSUING JUDGE.**

(capitalization and emphasis in original). The subsequent execution of the Broward County Circuit Court Order at Storck's Coral Springs home, which resulted in Storck's arrest, forms the factual basis for this § 1983 action.

That same day, pursuant to the Broward County Circuit Court Order, officers from the Broward Sheriff's Office ("BSO") and the CSPD surrounded Storck's residence for the purpose of taking Aaron into custody. A number of CSPD officers, including Officers Caffray, Randolph, and McHugh, were dispatched to assist in the enforcement of the custody decree pursuant to a material assistance agreement between the BSO and CSPD. By Storck's account, she noticed police officers in her apartment complex around 3:00 p.m., but thought that they might be there investigating another tenant. However, she conceded she was fully aware that Suffolk DSS was attempting to obtain a court order to retake possession of Aaron. As Storck put it, "It was not a surprise that they [Suffolk DSS] would not give up and go away." Indeed, Storck had received a phone call from her attorney that very morning and was advised that Suffolk DSS was trying to retake custody of Aaron. At some point after observing the police officers in

8

her parking lot, Storck, accompanied by Aaron, left her apartment briefly to go to a neighbor's house.  Upon spotting the police presence in her parking lot, Storck hastily retreated back into her apartment with Aaron.[2]

At about 4:30 or 4:45 p.m., Storck heard a female officer, later identified as Officer Caffray, an experienced hostage negotiator, speak to her through a bullhorn and say, "Ellen, answer the phone now."  According to Storck, when she heard the bullhorn, she was on a conference call with Patrick Gonya and Amy Hickman, who are Aaron's attorneys.  Storck does not dispute that she had call-waiting and it is clear from the record that at that point she must have known the police were there for Aaron, based not only on the morning phone call from the attorneys but also on her conduct when she left the apartment briefly, spotted the police, and hurried back inside.  It is also undisputed that the BSO and CSPD officers had been trying to call Storck for no less than 15-30 minutes, but that Storck did not answer until after she was directed to do so on the bullhorn.  As she noted in her deposition, when she heard the bull horn, she was "at that point

---

[2]     It is not clear from the record exactly when Storck exited and reentered her home. According to the CSPD "After Action Report," the CSPD officers on the scene had been advised that Storck "had made threats that she would not let anyone take her son even if it meant killing herself and/or her son."  Storck denies making any threats.

concerned because these police had been out there for such a long period of time .
. . ."

When she heard the bullhorn, she clicked over to the other line and spoke to Officer Caffray. According to Storck, Officer Caffray told her that the police were there to serve her with papers concerning a court hearing the following week, but denied that she had a "pick-up" order for Aaron. At least three times, Storck asked Caffray what the hearing was about, and the officer said that she did not know. Storck continued to ask Caffray for still more information and clicked back and forth on the telephone line between her call with Caffray and her conference call with attorneys Gonya and Hickman for no less than 30-45 minutes and possibly longer. In total, according to Storck's deposition, she clicked back and forth between Caffray and the attorneys between eight and ten times. During this time, according to Storck, "we were waiting for her [Caffray] to tell us or to tell me [what the hearing was about]" and the attorneys "were trying to through their own sources find out what was going on." At one point, Storck told Caffray "to just leave the papers" and advised Caffray, "I will be at your hearing on Thursday." When Caffray told Storck she could not "just leave the papers," but had to serve Storck with them, Storck still refused to cooperate.

10

After this 30- to 45-minute period of clicking back and forth on the phone asking for more details about the order and the hearing on Thursday, Storck finally exited her apartment and, according to her deposition, was knocked to the ground by BSO and CSPD officers and arrested for obstruction of justice. Officer McHugh was responsible for handcuffing Storck.

Almost four years later, on December 26, 2001, Storck filed this lawsuit against the City of Coral Springs, and Officers Caffray, McHugh, and Randolph (an officer who helped maintain a perimeter behind the residence). She brought § 1983 civil rights claims against the officers in their individual capacities based on alleged violations of her Fourth and Fourteenth Amendment rights to be free from false arrest and unreasonable seizure. She also asserted, pursuant to state law, a false-arrest claim against the City of Coral Springs. The district court granted summary judgment in favor of the City of Coral Springs because Storck failed to give timely notice to the City as required by Fla. Stat. § 768.28(6), and in favor of Officers Randolph and Caffray, after Storck conceded that she had no good-faith § 1983 claims against them.[3]

---

[3] The summary judgment orders in favor of Coral Springs, Randolph, and Caffray are not at issue in this appeal.

11

The district court granted summary judgment in favor of Officer McHugh on the basis of qualified immunity. The district court found, among other things, that McHugh reasonably could have believed that Storck was committing or was attempting to commit a violation of Fla. Stat. § 843.02 (providing that "[w]hoever shall resist, obstruct, or oppose any officer . . . in the lawful execution of any legal duty . . . shall be guilty of a misdemeanor of the first degree"), and that McHugh, at the very least, had arguable probable cause to arrest Storck for violating that statute. Thus, the district court determined that McHugh was entitled to qualified immunity:

> The Court finds, based upon the totality of the circumstances and the collective knowledge of the officers assembled at her residence, that Officer McHugh enjoys qualified immunity as to Ms. Storck's claim of false arrest. Even after considering the facts in the light most favorable to Ms. Storck, the Court finds that Ms. Storck's undisputed lack of cooperation with the officers is sufficient to satisfy the minimal standard of arguable probable cause. In short, Ms. Storck failed to carry her burden of demonstrating that no reasonable officer could have found probable cause under the totality of the circumstances.

This appeal followed.

## II.

On appeal, Storck argues essentially that significant factual disputes exist on the issue of whether Officer McHugh had arguable probable cause, thus

12

preventing the district court from granting summary judgment based on qualified immunity. Storck urges that arguable probable cause did not exist to arrest her for a violation of § 843.02 because she never saw the Broward County Circuit Court Order directing the police to take Aaron into custody and because the arresting officers concealed the true nature of the Broward County Circuit Court Order from her prior to her arrest.[4]

Qualified immunity provides protection for government officials performing discretionary functions and sued in their individual capacities as long as their conduct violates no "clearly established statutory or constitutional rights of which a reasonable person would have known." Lassiter v. Ala. A & M Univ., Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)). As we said in Lee v. Ferraro:

> Qualified immunity offers "complete protection for government officials sued in their individual capacities as long as 'their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known.'" Thomas v. Roberts, 261 F.3d 1160, 1170 (11th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)) (additional quotations omitted). The purpose of this immunity is to allow government officials to carry out their discretionary duties

---

[4] Since we find that arguable probable cause existed, we need not and do not address Storck's arguments going to actual probable cause.

13

without the fear of personal liability or harassing litigation, <u>see</u> <u>Anderson v. Creighton</u>, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038, 97 L. Ed. 2d 523 (1987), protecting from suit "all but the plainly incompetent or one who is knowingly violating the federal law." <u>Willingham v. Loughnan</u>, 261 F.3d 1178, 1187 (11th Cir. 2001). Because qualified immunity is a defense not only from liability, but also from suit, it is "important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." <u>GJR Invs., Inc. v. County of Escambia</u>, 132 F.3d 1359, 1370 (11th Cir. 1998) (citation omitted).

284 F.3d at 1193-94. If reasonable public officials could differ on the lawfulness of a defendant's actions, the defendant is entitled to qualified immunity. <u>See</u> <u>Hunter v. Bryant</u>, 502 U.S. 224, 228, 112 S. Ct. 534, 537, 116 L. Ed. 2d 589 (1991).

Under qualified immunity analysis, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly unconstitutional acts took place. <u>See</u> <u>Courson v. McMillian</u>, 939 F.2d 1479, 1487 (11th Cir. 1991). Here, it is undisputed that McHugh was acting within the scope of his discretionary authority when he arrested Storck.

Once the public official has established that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to establish that qualified immunity does not apply. <u>See</u> <u>Lee v. Ferraro</u>, 284 F.3d at 1194. To determine if the plaintiff has met her burden, we apply the Supreme Court's

14

two-part test for evaluating a claim of qualified immunity: (1) "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" and (2) if a constitutional right would have been violated under the plaintiff's version of the facts, the court must then determine "whether the right was clearly established." Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). Thus, if no constitutional violation is established, then the officer prevails, and "there is no necessity for further inquiries concerning qualified immunity." Id. On the other hand, if the facts establish a constitutional violation, we must determine whether, at the time of the violation, the right was clearly established, an inquiry that "must be undertaken in light of the specific context of the case [and] not as a broad general proposition . . . ." Id.

Here, Storck argues that McHugh violated her Fourth and Fourteenth Amendment rights by arresting her without probable cause. "Plainly, an arrest without probable cause violates the right to be free from an unreasonable search under the Fourth Amendment." Durruthy v. Pastor, __ F.3d __, 2003 WL 22799497, at *4 (11th Cir. Nov. 26, 2003) (citing Redd v. City of Enterprise, 140 F.3d 1378, 1382 (11th Cir. 1998)). However, "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in

his presence, he may, without violating the Fourth Amendment, arrest the offender." Atwater v. City of Lago Vista, 532 U.S. 318, 354, 121 S. Ct. 1536, 1557, 149 L. Ed. 2d 549 (2001). Probable cause is "defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." Gerstein v. Pugh, 420 U.S. 103, 111, 95 S. Ct. 854, 862, 43 L. Ed. 2d 54 (1975) (internal quotation marks, citation, and brackets omitted). "[F]or probable cause to exist, an arrest must be objectively reasonable under the totality of the circumstances." Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998) (internal quotation marks and citation omitted).

Moreover, officers "are entitled to qualified immunity if there was [even] arguable probable cause for the arrest." Jones v. Cannon, 174 F.3d 1271, 1283 (11th Cir. 1999) (citing Lindsey v. Storey, 936 F.2d 554, 562 (11th Cir. 1991)) (emphasis added). "Arguable probable cause exists when 'an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed.'" Durruthy v. Pastor, 2003 WL 22799497, at *5 (quoting Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997)). "This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is

16

committing, or is about to commit an offense." Rankin v. Evans, 133 F.3d at 1435 (internal quotation marks and citation omitted). Based on our review of the record, we have little trouble finding that McHugh had arguable probable cause to arrest Storck for violating § 843.02.

Section 843.02 provides, in pertinent part: "Whoever shall resist, obstruct, or oppose any officer . . . in the execution of legal process or in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor . . . ." Fla. Stat. § 843.02. To support a conviction under § 843.02, the state must show: (1) the officer was engaged in the lawful execution of a legal duty; and (2) the action by the defendant constituted obstruction or resistance of that lawful duty. See H.A.P. v. State, 834 So. 2d 237, 239 (Fla. Dist. Ct. App. 2002); V.L. v. State, 790 So. 2d 1140, 1142 (Fla. Dist. Ct. App. 2001); Jay v. State, 731 So. 2d 774, 775 (Fla. Dist. Ct. App. 1999); S.G.K. v. State, 657 So.2d 1246, 1247 (Fla. Dist. Ct. App. 1995). Notably, under Florida law, "it is a crime not only to oppose or to obstruct a law officer in the execution of the officer's duty, but also to attempt to oppose or to obstruct the officer." Post v. City of Fort Lauderdale, 7 F.3d 1552, 1558-59 (11th Cir. 1993) (emphasis added).

On the question of whether an officer was performing a legal duty for purposes of a conviction under § 843.02, "'it is important to distinguish between a police officer in the lawful execution of any legal duty and a police officer who is merely on the job.'" Jay, 731 So. 2d at 775 (internal citation omitted) (quoting D.G. v. State, 661 So. 2d 75, 76 (Fla. Dist. Ct. App. 1995)). Job functions that qualify as falling within the ambit of "the lawful execution of any legal duty" under Florida law include an officer's (1) serving process, (2) legally detaining a person, and (3) asking a person for assistance with an ongoing emergency. See Jay, 731 So. 2d at 775; D.G., 661 So. 2d at 76. Here, it is clear that Officer McHugh was engaged in the lawful execution of a legal duty -- executing the Broward County Court Order that directed the police to take Aaron into custody -- and not "merely on the job."

It is equally plain that an officer in McHugh's place reasonably could have perceived Storck's conduct as amounting to obstruction of or resistance to the execution of a lawful duty, or at least an attempt to do so, within the meaning of § 843.02. It was undisputed that, upon the officers' arrival at Storck's apartment complex, the officers waited for no less than two hours to carry out the custody decree, despite the plain language of the Broward County Circuit Court Order, which provided that all sheriffs of the State of Florida were charged with authority

18

to take possession of Aaron <u>immediately</u>. Again, the Order authorized the police to (1) "serve and enforce this Order in the daytime or in the nighttime, and if necessary to break the door where the minor is believed to be residing or being kept"; (2) "immediately arrest and incarcerate" any person who "in any way violate[s] the mandates of this Order in the presence of the Law Enforcement Officer"; and (3) incarcerate the offending party "until such time [as] the attending party may be brought before this Honorable Court for further proceedings as this Court may deem just and proper under the circumstances."

Despite the Circuit Court's unambiguous grant of authority to take immediate action, it is not disputed that upon arrival at Storck's apartment complex, the team of officers of which McHugh was a member waited for over two hours to execute the court order. During this extended time frame, Storck exited and hurriedly reentered her house upon seeing the police. She refused to answer the telephone for about 30 minutes when the police called her, despite the fact that she quite apparently knew the police were at the complex on account of Aaron and were trying to contact her on the phone to that end. Storck even admitted in her deposition that when she heard the bullhorn announcement, she was "at that point concerned because these police had been out there <u>for such a long period of time</u> . . . ."

19

After finally answering Caffray's call and being told that the police were there to serve her with papers concerning a hearing the following week, Storck proceeded to debate the validity and contents of the Order and demanded details about it from Caffray before she would accept process. At least three times, Storck asked Caffray what the hearing was about, and the officer said that she did not know. During her phone call with Officer Caffray, Storck clicked back and forth to discuss the Order and what Caffray was telling her with the attorneys no less than eight times and for not less than thirty minutes. Indeed, as we have noted, at one point during the stand-off Storck told Officer Caffray to just leave the papers, advising the officer that she would be at Thursday's hearing. After this prolonged period of clicking back and forth on the phone and asking for more details about the Order and the hearing on Thursday, Storck finally exited her apartment. We add that, in the past, officers from the same police department had attempted to take custody of Aaron, pursuant to a court order -- albeit, an undomesticated order -- and, during their conversation with Storck, Aaron snuck out of the back window of the apartment.

In Post v. City of Fort Lauderdale, the plaintiffs, a restaurant owner and the manager of the restaurant, brought a § 1983 civil rights action against, inter alia, a police officer for false arrest in connection with the officer's assistance with a Fort

Lauderdale City Code team's inspection of the restaurant premises. See 7 F.3d at 1555. This resulted in the owner's arrest for violating the City Building Code's maximum-capacity requirements and for interfering with an officer, and the manager's arrest for obstructing an officer and resisting arrest. See id. The manager alleged that the officer falsely arrested him for violating § 843.02, in violation of his Fourth Amendment rights. Id. at 1558-59. The officer-defendant asserted that he was entitled to qualified immunity because he had arguable probable cause to believe that the manager had committed or was about to commit a violation of § 843.02. Id. at 1559. A panel of this Court agreed, observing that "the issue again is not whether [the manager] did, in fact, commit acts of obstruction and resistance or even, in fact, attempt to do so." Id. at 1559 n.8. Rather, "the issue material to qualified immunity is whether a reasonable officer . . . could have thought the facts were such that he could reasonably conclude that [the manager] was committing, or was about to attempt, acts of obstruction or resistance." Id.

Thus, viewing the facts in the light most favorable to Storck, she has not established a constitutional violation because, at the very least, McHugh had arguable probable cause to believe that Storck was "oppos[ing] or . . . obstruct[ing] a law officer in the execution of the officer's duty, [or] attempt[ing]

21

to oppose or to obstruct the officer." Post, 7 F.3d at 1559. Put another way, based on the totality of the circumstances, that is, "the facts and circumstances within the officer's knowledge," McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) (quoting Lee v. Ferraro, 284 F.3d at 1195), we have little trouble concluding that McHugh reasonably could believe that Storck was obstructing his execution of a legal duty by impeding, resisting, or preventing him from carrying out the Broward County Circuit Court Order, which, by its terms, authorized immediate action on the part of the police.[5] Indeed, although the police employed a ruse to induce Storck out of the home and therefore knew that Storck believed that she was going to be served with papers for a hearing, her recalcitrance on the day of the arrest and in the past could well have led an officer in McHugh's position to reasonably believe that Storck was obstructing or would obstruct execution of the custody decree.

---

[5] The analysis of arguable probable cause is not concerned with what Storck thought or knew, but rather, what a reasonable officer knowing what Officer McHugh knew could have thought. See Durruthy v. Pastor, 2003 WL 22799497, at *7 (highlighting that "probable cause is determined based on the facts and circumstances within the officer's knowledge" (internal quotation and citation omitted)); see also Dahl v. Holley, 312 F.3d 1228, 1233 (11th Cir. 2002) (holding that the probable cause standard is met if, "at the moment the arrest was made, 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [the suspect] had committed or was committing an offense" (quoting Hunter v. Bryant, 502 U.S. 224, 228, 112 S. Ct. 534, 537, 116 L. Ed. 2d 589 (1991)).

22

Moreover, even if Storck had presented sufficient facts to allege a violation of a constitutional right -- and on this record Storck has failed to do so -- here such a right was not clearly established. A party may show that the law was clearly established by (1) pointing to "'a materially similar case [that has] already decided that what the police officer was doing was unlawful,'" Lee v. Ferraro, 284 F.3d at 1198 (citation omitted); or (2) demonstrating that "the words of the pertinent federal statute or federal constitutional provision . . . [are] specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the total absence of case law. This kind of case is one kind of 'obvious clarity' case." Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002) (footnote omitted).[6] Thus, "the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful." Id. "The unlawfulness must have been apparent." Willingham v. Loughnan, 321 F.3d 1299, 1301 (11th Cir. 2003) (internal citation omitted). "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a

[6] This case does not present the other kind of "obvious clarity" case where a "broad statement[ ] of principle in caselaw [that is] not tied to particularized facts . . . can clearly establish law applicable in the future to different sets of detailed facts." Vinyard v. Wilson, 311 F.3d at 1351.

23

plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." Lassiter, 28 F.3d at 1149; see also Williams v. Consol. City of Jacksonville, 341 F.3d 1261, 1270 (11th Cir. 2003) (noting that in determining whether the unlawfulness of an official's actions was clearly established, "the salient question . . . is whether the state of the law [at the time of the unconstitutional act] gave [the official] fair warning that [his] alleged treatment of [the plaintiff] was unconstitutional." (quoting Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516, 153 L. Ed. 2d 666 (2002)).

Storck does not provide, and our own independent research has not revealed, any case law to support the notion that an officer armed with a valid state circuit court order of the type involved in this case must provide notice to a non-cooperative third-party before executing the order. Indeed, the Broward County Circuit Court Order is based on Florida Rule of Family Law Procedure Form 12.941(e), "Order to Pick-Up Minor Child(ren)." Contrary to Storck's argument that she was entitled to notice, Form 12.941(e) expressly provides that the order is "issued without prior notice to the non-movant" and is meant to inform "all parties involved in this matter . . . that they are scheduled to appear and testify at a

24

hearing regarding this matter" on a set date.  See Fla. R. Fam. L. P. Form 12.941(e) (emphasis added).

As provided in Rule 12.941(e), the Broward County Circuit Court Order indicated that it was entered "ex-parte" and expressly set a hearing on the matter: "[T]his matter shall be set for hearing on January 15, 1998, at 10:45 a.m. at the Broward County Judicial Center."  Accordingly, we are unpersuaded by Storck's argument about her right to know in advance what was in the Order that the BSO and CSPD officers were trying to serve on her.  We also note the Order specifically directed that Suffolk DSS could not remove Aaron from the jurisdiction "until further order of this court."  Cf. Ain v. Ain, 778 So. 2d 1029, 1030 (Fla. Dist. Ct. App.), rev. denied, 800 So. 2d 612 (Fla. 2001) (upholding temporary injunction, entered only three hours after notice to mother, preventing mother from removing children from jurisdiction; holding that findings of fact are not necessary for entry of such an injunction, based on explicit language of Rule 12.941).  As we read it, the Broward County Circuit Court Order complied fully with the procedural requirements of Form 12.941(e), which contains no pre-order notice requirement.  Accordingly, we cannot find that Officer McHugh's conduct was "so obviously wrong, in the light of pre-existing law, that only a plainly

25

incompetent officer or one who was knowingly violating the law would have done such a thing." Lassiter, 28 F.3d at 1149.

Moreover, since the Fourth Amendment normally requires little more notice than a knock on the door prior to a forced entry pursuant to a lawfully issued warrant, we hardly could conclude on this record that Storck did not receive any requisite notice to which she otherwise may have been entitled under controlling caselaw. See Wilson v. Arkansas, 514 U.S. 927, 931, 115 S.Ct. 1914, 1916, 131 L. Ed. 2d 976 (1995) (holding that the "common law knock-and-announce principle forms a part of the Fourth Amendment reasonableness inquiry"). In fact, the Supreme Court recently noted that the knock-and-announce requirement "gives way when officers 'have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or . . . would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.'" United States v. Banks, __ U.S. __, 124 S. Ct. 521, 525, 2003 WL 22843793, *4 (Dec. 2, 2003) (quoting Richards v. Wisconsin, 520 U.S. 385, 394, 117 S. Ct. 1416, 1424, 137 L. Ed. 2d 615 (1997)).

Finally, we are unpersuaded by Storck's suggestion that misleading her about the nature of the Broward County Circuit Court Order or that the use of such a ruse under the circumstances otherwise converts what would be reasonable into

26

something constitutionally unreasonable. The use of subterfuge in law enforcement activities has long been recognized by the Supreme Court.  For example, in the context of undercover operations, the Court  has stated that "the Government is entitled to use decoys and to conceal the identity of its agents. The various protections of the Bill of Rights, of course, provide checks upon such official deception for the protection of the individual." Lewis v. United States, 385 U.S. 206, 209, 87 S. Ct. 424, 426, 17 L. Ed. 2d 312 (1966); see also United States v. DeFeis, 530 F.2d 14, 15 (5th Cir. 1976) (finding no violation of 18 U.S.C. § 3109, regulating the breaking of doors or windows for entry or exit to execute a search warrant, where undercover agent posing as a narcotics buyer entered individual's home on a ruse to provide prearranged signal to other officers waiting to invade home from outside).

Thus, just as officers armed with a valid search warrant may engage in a ruse to gain entry into a private home, here, the CSPD officers who plainly had a valid court custody order and the concomitant power to execute the order at any time committed no violation of a clearly established constitutional right under these circumstances.[7]  See also Frazier v. Cupp, 394 U.S. 731, 739, 89 S. Ct. 1420, 1424-25, 22 L. Ed. 2d 684 (1969) (holding that an officer's lie to the defendant

---

[7] The validity of the Broward County Circuit Court Order has not been challenged.

27

that his co-conspirator had confessed was insufficient to make an otherwise voluntary confession inadmissible); Katz v. United States, 389 U.S. 347, 355 n.16, 88 S. Ct. 507, 513 n.16, 19 L. Ed. 2d 576 (1967) (observing that "officers need not announce their purpose before conducting an otherwise [duly] authorized search if such an announcement would provoke the escape or the destruction of evidence"); United States v. Michaud, 268 F.3d 728, 733 (9th Cir. 2001) ("We have held that there is no constitutional mandate forbidding the use of deception in executing a valid arrest warrant." (internal quotation marks and citation omitted)).

Here, pursuant to clearly established law, Storck was not entitled to the "flow of information" that she demanded and without which, she now claims her constitutional rights were violated. Cf. Moran v. Burbine, 475 U.S. 412, 422, 106 S. Ct. 1135, 1141, 89 L. Ed. 2d 410 (1986) ("[W]e have never read the Constitution to require that [after providing Miranda warnings] the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights."). An unambiguous court order had been entered, and the police were obliged to execute it. On this record, Storck has not satisfied her burden of showing that the law was clearly established by pointing to "a materially similar case [that has] already decided that what the

police officer was doing was unlawful." Lee v. Ferraro, 284 F.3d at 1198 (citation omitted).

Moreover, Storck has not established, alternatively, that this case is one of "obvious clarity." See Vinyard v. Wilson, 311 F.3d at 1350. On this record, Storck cannot show that "the words of a federal statute or federal constitutional provision [are] so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful." Id. Simply put, nothing in the language of § 843.02 or in the command of the Fourth Amendment states with "obvious clarity" that McHugh's arrest of Storck was unlawful.

In short, we are satisfied that Storck failed to establish a constitutional violation, and that even if she did, she has not shown that it was "clearly established," within the meaning of qualified immunity analysis. Accordingly, we affirm the final judgment of the district court.

**AFFIRMED.**