[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

**FILED**
**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**July 18, 2005**
**THOMAS K. KAHN**
**CLERK**

No. 04-15719
Non-Argument Calendar

_____

D. C. Docket No. 03-00069-CR-4-SPM-AK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARCUS NEAL MANNING,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(July 18, 2005)**

Before TJOFLAT, ANDERSON and HULL, Circuit Judges.

PER CURIAM:

Defendant Marcus Neal Manning appeals his convictions for distribution of

cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), possession with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(iii), and possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(8) and 924(a)(2). Manning argues on appeal that the district court erred in denying his three motions to suppress drugs, drug paraphernalia, and a firearm found by officers in his apartment while executing a search warrant, and that he thus is entitled to a new trial. After review, we affirm.

## I. BACKGROUND

On October 3, 2003, law enforcement officers arrested Manning a short distance from his home pursuant to an arrest warrant. That same day, law enforcement officers executed a search warrant of his home. During that search, officers discovered crack cocaine, drug paraphernalia, and a firearm. Manning subsequently was charged with distribution of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (count 1); possession with intent to distribute crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(iii) (count 2); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (count 3); and possession of a firearm while subject to a domestic violence restraining order, in violation of 18 U.S.C. §§ 922(g)(8) and 924(a)(2) (count 4).

2

## A. First Suppression Motion

Prior to trial, Manning moved the district court to suppress the drugs, drug paraphernalia, and firearm seized from his home during the execution of a search warrant, contending that the warrant was executed in an unreasonable manner. In that motion, Manning asserted that officers watched his apartment in preparation of serving an arrest and search warrant, saw him leave his apartment, and arrested him a short distance from his house. According to Manning, while officers detained him in the location of his arrest, another group of officers broke open his door to conduct the search of his apartment. He asserted that by the time the officers returned him to his apartment, the other officers had already found the drugs and firearm. Manning further argued that there were no exigent circumstances and that the officers did not have to break into his apartment. More specifically, Manning contended the officers could have returned him to his apartment and offered him the opportunity to unlock the door and inform officers of the location of the contraband, in order to avoid property damage and limit the scope of the officers' search.

The government's account of the facts was materially different. According to the government, officers David Duncan and Gary Hunnings stopped Manning near his home, placed him under arrest, and returned him to his apartment. Upon

their return to Manning's apartment, and while other officers were taking Manning out of the car, officers Duncan and Hunnings knocked loudly on Manning's door and announced that they were from the Sheriff's Office and were executing a search warrant.

After receiving no response, officer Duncan asked Manning if there was anyone in the apartment, and Manning did not respond. Duncan was concerned that someone was in the apartment destroying evidence. Duncan thus determined that immediate entry was necessary, and forced open the door. According to the government, Manning was present at the apartment but did not inform officers that he had keys to unlock the door until after officers forced the door open.

Upon entering the apartment, the officers did a protective sweep, during which Duncan saw a Nike shoe box containing crack. After the protective sweep, Duncan directed Manning to enter and sit in the apartment. Manning originally refused, but, after speaking with an officer whom he knew, complied with the officers' instructions. Officers had Manning sit in a chair in his home and read Manning the search warrant, while other officers searched the home. Officers found more drugs and a firearm while Manning was in the apartment.

The district court conducted a hearing, at which two officers testified consistent with the government's factual account. In addition, a videotape of the

4

search showed Manning sitting in the apartment during the search and showed the discovery of the handgun and other drugs.

Robert Baucham testified on Manning's behalf regarding what he saw at the arrest scene. Baucham indicated that he saw a patrol car leave with a tow truck. Although Baucham did not see Manning in the patrol car, others told him that Manning was in the car. The district court stated that Baucham's testimony suggested that Manning was not immediately returned to his apartment after his arrest; however, the district court discounted that suggestion because Baucham did not actually see Manning in the patrol car and, according to the testimony of the officers, a second patrol car was called to the arrest scene to oversee the impoundment of Manning's vehicle.

The other defense witness, George Simmons, testified that he lived in the apartment immediately below Manning's apartment. Simmons heard loud noises coming from Manning's apartment, as if the apartment were being torn apart. He looked out the window and saw a patrol car and several officers, but did not see Manning. Fifteen to twenty minutes later, Simmons saw Manning walk up to the apartment from the road and heard the officers threatening to drag Manning up the stairs if he did not walk. He saw Manning go up to the apartment and heard more noises coming from the apartment. However, Simmons acknowledged that he did

5

not keep a constant watch of the scene, but walked back and forth to his window to look outside.

The district court found that Simmons's testimony was generally consistent with the officers' testimony. Although Simmons did not see Manning initially, it was unclear whether Manning was in Simmons's line of view from the window, and it was unclear whether Manning was placed back in the patrol car during the protective sweep.

The district court thus found that: (1) Manning was present at the apartment at the time the search began and failed to respond to the officers when they asked if anyone was inside the apartment; (2) the officers were concerned that someone was in Manning's apartment destroying evidence; (3) Manning did nothing to allay those fears, and it did not appear that Manning would respond positively to a request to open the door immediately; and (4) after the protective sweep, Manning was led into the apartment so he could be present during the search. Based on these findings, the district court concluded that the officers' actions in executing the search warrant were reasonable and valid under the circumstances. Accordingly, the district court denied Manning's motion to suppress.

**B. Second Suppression Motion**

Manning filed a second motion to suppress, arguing that the search warrant

in his case was based on an affidavit containing false information and that the inclusion of that information amounted to a reckless disregard for the truth.

The search warrant was issued as a result of an affidavit submitted by officer Hunnings. The Hunnings affidavit indicated that during their investigation of Manning, the officers used Anthony Sanders, a confidential informant (CI), to make three purchases. Prior to each purchase they searched Sanders to ensure he did not possess cocaine, equipped him with audio or video recording equipment, provided him with cash, and sent him to Manning's apartment to buy cocaine. Each time, Sanders returned with cocaine.

According to Manning, after the government revealed that Sanders was the confidential informant, Sanders contacted Baucham, who formerly served as a CI, for advice. According to Manning, Sanders admitted to Baucham that he had not purchased cocaine from Manning, but had only entered Manning's residence and spoken to him briefly. Prior to being searched by the officers, Sanders hid drugs in his mouth, and those were the drugs he gave to the officers when he returned from Manning's apartment. Sanders told Baucham that, in exchange for his assistance, officer Jeff Lockley promised to pay Sanders, to allow him to keep some of the drugs, and not to interfere with his personal drug transactions.

Manning argued that Sanders was a drug user with numerous felony

convictions, and thus was unreliable. Further, the officers supervising Sanders's transactions with Manning did not maintain visual surveillance and did not conduct a reasonable search of Sanders prior to his meetings with Manning. Manning also asserted that the video recording of one of the transactions did not actually capture a transaction, but only showed Manning holding money and a bag that might or might not have contained drugs, and that the quality of the audio recording of a second transaction was so poor that it was impossible to tell whether a drug transaction occurred. Under these circumstances, Manning argued that Hunnings should have known that Sanders was lying about the controlled buys and that Hunnings's inclusion of the controlled buys in the affidavit demonstrated a reckless disregard for the truth.

The district court held a hearing, at which Baucham testified that Sanders approached him and told him he had given drugs to officer Hunning, but that he had not obtained those drugs from Manning. Sanders told Baucham about two occasions in which he approached Manning to talk about drugs, but neither he nor Manning ever mentioned drugs. According to Baucham, Sanders hid drugs in his mouth, which officers never searched, and later gave the officers the drugs he had hidden. Baucham further testified that Sanders was a drug user.

Officer Hunnings testified that he searched Sanders's person, bicycle, and

8

clothing before the controlled buys, but did not search his mouth. Sanders spoke normally before the buys, and it never occurred to officer Hunnings to search Sanders's mouth. The officers monitored Sanders through a radio transmitter and/or watched him constantly as he traveled to and from Manning's apartment.[1] officer Hunnings did not see Sanders retrieve hidden drugs or money.

The government also played a videotape of the third controlled buy, and officer Hunnings indicated that in the video, Manning had money in his hand and appeared to be retrieving a plastic baggy containing crack rocks. Officer Hunnings testified that he believed he witnessed a crack deal. Officer Hunnings also indicated that when Sanders returned from the buy, he gave Hunnings an amount of crack cocaine that was consistent with the amount of money Hunnings had given Sanders for the purchase.

Officer Hunnings testified that to his knowledge, officer Lockley never told Sanders that he could buy or keep crack cocaine. Officer Hunnings was aware of Sanders's significant criminal history. However, Sanders was paid the same for each transaction whether or not he successfully purchased drugs; he had previously provided reliable information in 15-20 cases with officer Hunnings and in other

---

[1]During the second controlled buy, officers did not maintain constant visual contact since Sanders had a video recorder. The video, however, became unplugged and did not record the transaction.

cases with other officers; and he was searched and monitored closely. Under these circumstances, Hunnings testified he had no reason to believe that Sanders had faked the controlled buys.

The district court denied Manning's motion, finding that Manning failed to show that Hunning had a reckless disregard for the truth. The court concluded that the evidence presented at the hearing refuted Manning's argument that Hunning should have known Sanders was lying because the video tape corroborated Sanders's representation to Hunning that he purchased drugs from Manning. Even if Sanders faked the buys, Hunning took reasonable precautions to ensure the legitimacy of the controlled buys by searching Sanders's person and bicycle and supervising Sanders either visually or through recording devices.

## C. Third Suppression Motion

Manning filed a third motion to suppress, reasserting that the search warrant was issued as a result of an affidavit by officer Hunnings containing false information. The third motion made the same arguments presented in the second motion to suppress, but included an affidavit from Sanders indicating that he had not purchased crack cocaine from Manning.

During a hearing, Sanders testified that he was not searched by officer Hunnings prior to going to Manning's house, and he never bought cocaine from

10

Manning.  He received a total of $400 for his assistance, and he told officers that he bought cocaine from Manning because he wanted the money.

Officer David Odom, a Tallahassee police officer assigned to the DEA task force, testified that Sanders told him that he had obtained crack cocaine from Manning.  Officer Odom had reviewed with Sanders the videotape of the third controlled buy, and Sanders pointed out on the videotape when Manning was retrieving the cocaine.  Officer Odom further testified that, in their conversations about the second suppression motion, Sanders denied hiding crack in his mouth and pointed out that he spoke freely during the controlled buys and would not have been able to do so if he had crack in his mouth.

The district court denied Manning's third motion, again finding that Manning had not shown that officer Hunnings had a reckless disregard for the truth.  The court found that Sanders lacked credibility as a result of his prior inconsistent statements.  The court also concluded that the precautions taken by officer Hunnings and the surveillance recordings supported officer Hunnings's testimony that he believed Sanders actually bought cocaine from Manning.

## D.  Trial

After a three-day trial, a jury convicted Manning on the drug offenses in counts 1 and 2 and the firearm offense in count 4, but found him not guilty on the

11

firearm offense in count 3.  The court sentenced Manning to 151 months'
imprisonment on the drug offenses in counts 1 and 2, and 120 months'
imprisonment on count 4, all to run concurrently.  Manning timely appealed.

## II.  DISCUSSION

On appeal, Manning argues again that the district court erred in denying his
motions to suppress because: (1) the search of his home was unreasonable; and (2)
the search warrant was issued based on officer Hunnings's affidavit, which
contained statements in reckless disregard of the truth.  We address each argument
in turn.

### A.  Search of Manning's Home

Manning argues that the officers who searched his home acted unreasonably
in forcing entry into his home even though he was detained only a short distance
away and no exigent circumstances existed.  Manning disputes both the district
court's factual finding that Manning was present at the time the officers entered his
home and its legal conclusion that the search was conducted in a reasonable
fashion.[2]

As to the factual issue, the district court did not clearly err in determining

---

[2]We review the district court's factual findings for clear error and its legal conclusions de novo.  United States v. McGough, — F.3d —, 2004 WL 3389374, at *3 (11th Cir. June 15, 2005).

that Manning was present when the officers began the search of his home.  Two officers testified that Manning was present when the search began, and the district court found their testimony to be credible.  "We accord great deference to the district court's credibility determinations."  United States v. Gregg, 179 F.3d 1312, 1316 (11th Cir. 1999) (citation omitted).  Based on the officers' testimony, the district court did not commit reversible error in concluding that Manning was present.

In any event, the district court did not ignore, as Manning alleges, Simmons's testimony that he saw only one patrol car when he first heard noises in Manning's apartment and that he did not see Manning until minutes later.  Rather, the district court acknowledged Simmons's testimony, but discounted Simmons's statement that he did not see Manning because it was unclear whether Manning was in Simmons's line of view when he looked out the window.  The district court did not err in discounting Simmons's testimony based on his imperfect view of the events, and Manning has failed to show clear error in the district court's findings.

As for the legal issue, a search pursuant to a warrant is valid if it is conducted reasonably, examining the totality of the circumstances.  United States v. Banks, 540 U.S. 31, 36, 124 S. Ct. 521, 525 (2003).  While police officers are generally required to announce their intent to search before entering closed

13

premises, "the Fourth Amendment normally requires little more notice than a knock on the door prior to a forced entry pursuant to a lawfully issued warrant . . . ." Storck v. City of Coral Springs, 354 F.3d 1307, 1318 (11th Cir. 2003). Indeed, even the knock-and-announce obligation "gives way when officers have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." Banks, 540 U.S. at 36, 124 S. Ct. at 525 (quotation marks, punctuation, and citation omitted).

Here, the officers knocked and announced their presence to anyone who might have been inside Manning's apartment. In addition, they asked Manning whether anyone was in his apartment, and gave Manning an opportunity to cooperate and avoid the forced entry. Manning declined that opportunity by refusing to answer the officers, and it reasonably appeared that it would be futile to ask Manning to open the door immediately. Under these circumstances, in light of the officers' concern that someone could be in the apartment and easily could dispose of the cocaine in the kitchen, the officers' forced entry was reasonable.[3]

_____

[3]The government has not argued that the evidence found in Manning's apartment would be admissible under the inevitable-discovery doctrine even if the officers' conduct was unreasonable. Accordingly, any such argument was waived. In any event, we conclude that the search was reasonable, and we thus need not address whether the inevitable-discovery doctrine

14

See id. at 41, 124 S. Ct. at 527 (holding that forced entry was valid when officers waited 15 to 20 seconds after knocking and announcing at apartment, where police arrived during the day, when anyone inside probably would have been up and around, and 15 to 20 seconds would be sufficient for getting to the bathroom or kitchen to dispose of cocaine).

## B. Affidavit Supporting the Search Warrant

Manning also argues, pursuant to Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674 (1978), that the search warrant was invalid because the Hunnings affidavit supporting the warrant contained statements in reckless disregard for the truth. This argument is equally unavailing.

Under Franks, a defendant can have a warrant voided and the fruits of the search excluded based on false statements in the supporting affidavit only if he shows that: (1) the falsehood was deliberate or in reckless disregard for the truth; and (2) the affidavit's remaining content is insufficient to establish probable cause. Id. at 171-72, 98 S. Ct. at 2684-85; see also United States v. Novaton, 271 F.3d 968, 986-87 (11th Cir. 2001).

Here, Manning's motions were properly denied because he failed to show that officer Hunnings's affidavit contained statements in reckless disregard for the

___

would apply.

15

truth.[4]  The testimony of Baucham and Sanders indicated that <u>Sanders claimed</u> he faked the controlled buys.  However, the district court found Sanders to be incredible, and we defer to that finding.  <u>See</u> <u>Gregg</u>, 179 F.3d at 1316.  Further, Sanders admitted that he told Hunnings he had purchased cocaine from Manning and that he produced cocaine after the controlled buys.  Thus, even assuming that Sanders faked the controlled buys, Sanders's own testimony suggests that officer Hunnings reasonably believed Sanders purchased cocaine from Manning.

While officer Hunnings did not search Sanders's mouth because it did not occur to him, officer Hunnings did search Sanders's shirt, ankles, and bicycle before the controlled buy.[5]  In addition, officer Hunnings equipped Sanders with audio and video recording devices and obtained video footage that appeared to show a drug deal.  Although officer Hunnings perhaps could have taken further precautions, such as performing a more intrusive search or maintaining constant visual surveillance of Sanders, his failure to do so does not amount to a reckless disregard for the truth.  Manning cites no authority indicating otherwise.

For all the above reasons, the orders of the district court are affirmed.

**AFFIRMED.**

---

[4]Manning does not argue that officer Hunnings deliberately made false statements.

[5]Although Sanders claimed that officer Hunnings did not search him, the district court found Sanders incredible and found that officer Hunnings searched Sanders.